UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO.5:20-CR-505

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **SUPERSEDING CRIMINAL** |
| v. | ) | **INFORMATION** |
| | ) | |
| TIFFANY DAWN RUSSELL | ) | |

The United States Attorney charges at all relevant times:

## Introductory Allegations

1. From in or about August 2016 until the date of this Superseding Criminal Information, Defendant **TIFFANY DAWN RUSSELL (RUSSELL)** and others, known and unknown to the United States Attorney, conspired to execute several fraudulent schemes to obtain loans, lines of credit and credit cards by submitting or causing to be submitted materially false and fraudulent loan and credit applications to at least 12 financial institutions and the United States Small Business Administration (SBA), which in total, sought more than $2.5 million in fraudulent proceeds.

## Synthetic Identity Fraud

2. The federal government created the nine-digit social security number ("SSN") to track the earnings of United States workers, to determine a Social Security program applicant's entitlement to benefits, and to compute the applicant's benefit levels.

3. Over the years, use of the SSN has expanded to the private sector as its chief means of identifying and gathering information about an individual. By

combining a person's name, date of birth and SSN, businesses and financial institutions have been able to determine a person's credit worthiness.

4. Synthetic identity theft was a type of fraud in which various forms of information are combined to create a new identity. The forms of information often include stolen SSNs that have been issued by the United States Social Security Administration ("SSA") to children, or others who use little, if any, credit. The new identity was used to open financial accounts and make purchases from retailers, who accept the representations as true, and extend credit based upon the newly created identity.

5. The SSA issued SSN ending 2003 to **RUSSELL** and SSN ending 1428 to a male born in 2006.

6. Between on or about August 7, 2016 and on or about September 13, 2016, **RUSSELL** misrepresented in credit card and vehicle financing applications that her SSN ended in 1428. She also made material misrepresentations on these applications relating to her employment and residential address. **RUSSELL** used the credit she fraudulently obtained to, among other things, finance two vehicles, purchase furniture and pay for a plastic surgical procedure.

### Credit Washing Fraud

7. Equifax, Experian and TransUnion were Consumer Reporting Agencies (CRAs) which were in the business of assembling and evaluating consumer credit information and other information regarding consumers for the purpose of providing

2

credit reports about the credit-worthiness of consumers to third parties. CRAs also provided third parties with credit scores, which were based on a statistical methodology that quantifies the credit risk posed by a prospective borrower based on the information in the credit report.

8. The Fair Credit Reporting Act (FCRA) required CRAs to "block" or remove information in the file of a consumer within four business days after the consumer made a claim of identity theft. The FCRA required the consumers to provide the CRAs with appropriate proof of identity and an identity theft report filed with a law enforcement agency.

9. The Federal Trade Commission (FTC) was an independent agency of the United States government whose mission included consumer protection. Through IdentityTheft.gov, the FTC provided consumers with an online mechanism to report identity theft and to obtain the identity theft report required under the FCRA. Upon filing an identity theft report, the consumer declared, under penalties of perjury, that the information was true and accurate. The FTC warned that knowingly making any false statements to the government was a crime punishable by imprisonment.

10. **RUSSELL** had negative information in her credit history that made it difficult for her to obtain loans. From on or about August 2017 through on or about May 2021 (Equifax), **RUSSELL** mailed or caused others to mail from the Eastern District of North Carolina and other judicial districts, numerous claims to the CRAs falsely stating that her identify had been stolen and that certain negative

items on her credit reports were attributable to identity theft. To support her false claims, **RUSSELL** attached reports in her name that were electronically filed with the FTC or police departments. These reports similarly claimed she had been a victim of identity theft when she had not. Based upon her false claims, the CRAs removed legitimate debt accounts and other accurate information from her credit file, resulting in the issuance of materially inaccurate credit information to lenders from whom she sought additional loans, lines of credit and credit cards.

## Mortgage Fraud

11. Caliber Home Loans, Inc. (Caliber) and Homebridge Financial Services, Inc. (Homebridge) were financial institution within the meaning of Title 18, United States Code, Section 20, as private mortgage lending businesses.

12. Alliant Credit Union (Alliant) was a financial institution, within the meaning of Title 18, United States Code, Section 20, whose accounts and deposits of which were insured by the National Credit Union Share Insurance Fund.

13. On or about May 31, 2019, **RUSSELL** purchased a townhouse in Miami, Florida for approximately $660,000. To finance the purchase, she obtained loans from Caliber and Alliant in the approximate amounts of $484,350 and $109,580, respectively. In the loan applications, **RUSSELL** materially misrepresented her liquid assets and bi-weekly earnings. In support of these misrepresentations, **RUSSELL** submitted fabricated bank statements and bi-weekly payroll records, and a profit and loss statement from her law firm. Additionally, both financial

4

institutions relied upon inaccurate credit information regarding her creditworthiness due to **RUSSELL**'s illegal credit washing activity. Despite her representation to these financial institutions that the property was intended as a second residence, **RUSSELL** rented the property for approximately $5,400 per month.

14. On or about July 24, 2019, **RUSSELL** obtained a $106,500 mortgage loan from Homebridge for a Rocky Mount, North Carolina investment property. In support of the mortgage application, **RUSSELL** similarly provided fabricated bank statements and inflated bi-weekly payroll records. **RUSSELL** rented this property for approximately $1,300 per month.

15. On or about October 5, 2020, **RUSSELL** purchased a beachfront house in Nags Head, North Carolina for approximately $842,000. To finance the purchase, she obtained a $673,600 mortgage from Homebridge. Again, **RUSSELL** provided fabricated bank statements and inflated bi-weekly payroll records. **RUSSELL** also falsely certified this house was a second residence. Even before the closing, **RUSSELL** signed a contract with a management company to rent the property. Between January 1, 2021 and October 31, 2021, the management company collected approximately $129,865 in rent on RUSSELL's behalf.

## COVID Fraud

16. In March 2020, Congress passed the Coronavirus Aid, Relied, and Economic Security (CARES) Act, which was designed to provide emergency financial

5

assistance to millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

17. The United States Small Business Administration (SBA) was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small business and by assisting in the economic recovery of communities after disasters.

18. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program (PPP). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

19. To obtain a PPP loan, businesses were required to submit a PPP loan application, signed by an authorized representative of the business, acknowledging the program rules. The business was required to state (a) its average monthly payroll expenses and (b) the number of employees and to provide documentation showing their payroll expenses. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

20. A PPP loan application was required to be processed by a participating financial institution ("lender"). If a PPP loan application was approved, the lender funded the PPP loan using its own moneys, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

21. Cross River Bank, Loyal Trust Bank and Northern State Bank of Thief River Falls were financial institutions within the meaning of Title 18, United States Code, Section 20, whose accounts and deposits of which were insured by the Federal Deposit Insurance Corporation (FDIC). These financial institutions participated in the SBA's PPP program and, as such, were authorized to lend funds to eligible borrowers.

22. PPP loan proceeds were required to be used by businesses on certain permissible expenses: payroll costs, interest on mortgages, rent, and utilities. Loans provided through the PPP have government-backed guarantees and are 100% forgivable if the borrower submits documentation to the PPP lender and SBA demonstrating that at least sixty percent (60%) of the PPP loan proceeds were utilized to meet existing payroll obligations and to retain employees.

23. Another source of relief provided by the CARES Act was the Economic Injury Disaster Loan Program (EIDL). The SBA provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

24. The CARES Act authorized the SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruptions due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

25. To obtain an EIDL and advance, businesses were required to file an application with the SBA and provide information about its operations, such as the number of employees, gross revenue for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020.

26. EIDL applications were submitted electronically to the SBA and any funds issued under an EIDL or advance were issued directly by the SBA. The amount of the loan was determined based, in part, on the number of employees, gross revenue, and cost of goods. EIDL funds were permitted to be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. EIDL funds could not be used to expand or start a business. Additionally, if the applicant also obtained a loan under the PPP, the EIDL funds were not permitted to be used for the same purpose as the PPP funds.

27. Building Beyond, LLC., Building Beyond Solutions, Inc., Dubai Live Franchises, Inc., TDRLegal Property Management, LLC., and The Law Office of Tiffany D. Russell, PLLC. were business entities organized with the North Carolina Secretary of State and which **RUSSELL** served as an officer or member.

28. Between on or about March 30, 2020 and on or about June 29, 2020, RUSSELL and her co-conspirators caused the electronic filing of false and fraudulent PPP and EIDL loan applications. The PPP applications misstated, among other things, the monthly payroll and number of employees, and included as supporting documentation false and fraudulent Employers Quarterly Federal Tax Returns (IRS Forms 941). The EIDL applications misstated the number of employees, the gross revenue and costs of goods sold for each of these business entities.

29. As a result of these false and fraudulent applications, the financial institutions and the SBA funded the following PPP and EIDL loans:

| ENTITY | PPP | EIDL |
|---|---|---|
| Building Beyond, LLC | $63,400 | $150,000 |
| Building Beyond Solutions, Inc. | $125,410 | $45,000 |
| Dubai Live Franchises, Inc. | $334,292 | $55,800 |
| TDRLegal Property Management, LLC. | $40,902 | $3,000 |
| The Law Office of Tiffany D. Russell | $64,600 | $155,000 |
| Total | $628,604 | $408,800 |

30. **RUSSELL** and others, known and unknown to the United States Attorney, used the fraudulently obtained loan to, among other things, purchase real property, make improvements to real property, and pay personal expenditures.

9

## COUNT ONE

31. The United States Attorney realleges and incorporates by reference herein all of the allegations contained in paragraphs one through 30 of this Superseding Criminal Information, and further alleges that:

32. From on or about August 2016 until the date of this Superseding Criminal Information, in the Eastern District of North Carolina and elsewhere, defendant **TIFFANY DAWN RUSSELL** and others, known and unknown to the United States Attorney, did knowingly combine, conspire, confederate, agree, and have a tacit understanding with each other to commit offenses against the United States, *to wit:* Bank Fraud, in violation of Title 18, United States Code, Section 1341; Wire Fraud, in violation of Title 18, United States Code, Section 1341; and Financial Institution Fraud, in violation of Title 18, United States Code, Section 1344.

### Objects of the Conspiracy

33. *Mail Fraud*: It was a part and an object of the conspiracy that **RUSSELL** and others, known and unknown to the United States Attorney, having devised the above described schemes and artifices to defraud and for to knowingly execute the schemes and artifices to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, did knowingly place in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposit or cause to be deposited any matter or thing whatever

to be sent or delivered by any private or commercial interstate carrier, in violation of Title 18, United States Code, Section 1341.

34. *Wire Fraud:* It was a part and an object of the conspiracy that **RUSSELL** and others, known and unknown to the United States Attorney, having devised the above described schemes and artifices to defraud and for to knowingly execute the schemes and artifices to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, would and did transmit and cause to transmitted by means of wire communication in interstate commerce, any writing, sign, signal, picture, and sound for the purposes of executing said schemes and artifices, in violation of Title 18, United States Code, Section 1343.

35. *Financial Institution Fraud*: It was a part and an object of the conspiracy that **RUSSELL** and others, known and unknown to the United States Attorney, would and did execute and attempt to execute, the above-described schemes and artifices to defraud and to obtaining moneys owned by, or in the custody or control of financial institutions, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

## Manner and Means

36. **RUSSELL** and others, known and unknown to the United States Attorney, carried out the conspiracy in the manner and means as set forth in

11

paragraphs two through 30 above.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO

On or about November 15, 2018, in the Eastern District of North Carolina and elsewhere, defendant **TIFFANY DAWN RUSSELL**, did willfully make and subscribe a U.S. Individual Income Tax Return for the calendar year 2017, which was verified by a written declaration that it was made under penalties of perjury and which she did not believe to be true and correct as to every material matter. That income tax return, which was filed with the Internal Revenue Service, claimed as a credit the payment of approximately $26,679 in withholdings, whereas, as she then and there well knew she had not paid the withholdings to the Internal Revenue Service.

All in violation of Title 26, United States Code, Section 7206(1).

## FORFEITURE NOTICE

Defendant **TIFFANY DAWN RUSSELL** is hereby given notice that all of the defendant's interest in all property specified herein is subject to forfeiture.

Upon conviction of the offense set forth in Count One this Superseding Criminal Information, defendant **TIFFANY DAWN RUSSELL** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such offense(s).

The forfeitable property includes, but is not limited to, the following:

Forfeiture Money Judgment:

a) A sum of money representing the gross proceeds of the offense(s) charged herein against **TIFFANY DAWN RUSSELL** in the amount of at least $2,693,171.93.

Real Property:

a) Real property having the physical address of 455 NE 39th Street, Unit 105, Miami, Florida 33137, including any and all appurtenances and improvements thereto, being titled to TDRLEGAL PROPERTY MANAGEMENT, LLC, and legally described in a deed recorded at deed book 31568, page 1398, in the records of the Miami-Dade County Clerk of Court in the State of Florida, and any and all proceeds from the sale of said property;

b) Real property having the physical address of 713 Hill Street, Rocky Mount, North Carolina 27801, including any and all appurtenances and improvements thereto, being titled to TDRLEGAL PROPERTY MANAGEMENT, LLC, and legally described in a deed recorded at deed book 1713, page 480, of the Edgecombe County Registry in the State of North Carolina, and any and all proceeds from the sale of said property;

c) Real property having the physical address of 914 N. Fulton Avenue, Unit A, Baltimore, Maryland 21217, including any and all appurtenances and improvements thereto, being titled to TDRLEGAL PROPERTY MANAGEMENT, LLC, and legally described in a deed recorded at deed book 22120, page 4, in the records of the Baltimore City Circuit Court in the State of Maryland, and any and all proceeds from the sale of said property;

d) Real property having the physical address of 3017 Ensley Avenue, Birmingham, Alabama 35206, including any and all appurtenances and improvements thereto, being titled to TDRLEGAL PROPERTY MANAGEMENT, LLC, and legally described in a deed recorded as instrument no. 2020087919 in the Jefferson County Office of the Judge of Probate in the State of Alabama, and any and all proceeds from the sale of said property;

e) Real property having the physical address of 3133 Redwood Road, Durham, NC 27704, including any and all appurtenances and improvements thereto, being titled to TDRLEGAL PROPERTY MANAGEMENT, LLC, and legally described in a deed recorded at deed book 9024, page 625, in the Durham County Registry in the State of North Carolina, and any and all proceeds from the sale of said property;

f) Real property having the physical address of 135 W. Mobile Road, Harbinger, North Carolina 27491, including any and all appurtenances and improvements thereto, being titled to BWRM HOLDING COMPANY, and legally described in a deed recorded at deed book 1567, page 187, in the Currituck County Registry in the State of North Carolina, and any and all proceeds from the sale of said property;

Personal Property:

g) Approximately $385,495.92 in United States Currency currently held in the IOLTA trust account of Cheshire Parker Schneider, representing the proceeds of the sale of real property having the physical address of 3709 S. Virginia Dare Trail, Nags Head, North Carolina 27959, including any and all appurtenances and improvements thereto, being last titled, prior to said sale, to TDRLEGAL PROPERTY MANAGEMENT, LLC, and legally described in a deed recorded at deed book 2498, page 156, in the Dare County Registry in the State of North Carolina.

If any of the property described above, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

15

(5) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

MICHAEL F. EASLEY, JR
United States Attorney

BY: *(signature)*
SUSAN B. MENZER
Assistant United States Attorney

16